Good morning, Your Honors. Lisa Moff for Lamar Ryan. I'd like to focus first on the First-Fourth Amendment issue and then turn to sentencing, leaving about three minutes for rebuttal. Okay. On the Fourth Amendment issue, the key question is whether or not officers had an objectively reasonable basis to associate the vehicle with the emergency in this case. Let me ask you, Counsel, did Brigham City abrogate the nexus requirement of the emergency aid exception? I don't think it did, and I think this Court, in a published opinion in Hopkins, articulated and explained its reasoning why it did not. This Court in Hopkins specifically said the third prong of Cervantes, that is, there must be some reasonable basis approximating probable cause to associate with the emergency with the area or place we search, was unaffected by either Brigham City or Snipe and states our circuit's current law governing the emergency exception. Right, but then they didn't apply that, they didn't apply that third prong of Cervantes in Hopkins, so why isn't that just dicta? It's not just dicta because the published opinion squarely addresses the issue, and this Court has said in Kerr-Luck, which we cited in our briefing, that when a court squarely addresses an issue, it is binding on a later panel. There also is sort of no, the reasoning that the government gives in saying that the third prong of Cervantes doesn't really make sense in this context, because why would Brigham City, which was about the subjective versus objective intent of the officers, abrogate the third prong of Cervantes, which was about the nexus requirement? In addition... So why isn't the third prong met here? The third prong isn't met here because there isn't a reasonable basis approximating probable cause to associate the vehicle with the emergency. The government, sorry, the district court only identified two reasons particular to this vehicle. In other words, the government and the district court both had reasons associating with the emergency with the parking lot, but this particular vehicle was the one that was searched, and that they needed to justify the association. So because this vehicle was running, and if I recall from the photographic evidence, the agent even says, that one's running. Yes, Your Honor, that's correct, but as the government concedes in its answering brief, it was not the only vehicle that was running. The body-worn camera shows there were at least eight, and possibly as many as ten or twelve vehicles in the parking lot, and as I said in my... I don't recall any evidence regarding the most of the other vehicles, whether they were running or not. That's correct, and that is exactly the the concession the government makes, that we don't know how many other vehicles were running. It could be as many as, you know, the seven or eight other vehicles. Not likely in a parking lot, is it? I'm sorry? You think in a parking lot, most vehicles would be running? Your Honor, I think it's actually a critical fact in that, in this case, that it was a laundromat parking lot, and as the record shows, people who use a laundromat parking lot are sitting and waiting in their cars for them to switch their laundry. So the record in this case showed that at the end of interviewing the passenger, they actually asked her, oh, do you need to switch your laundry? And she does so. So there are people waiting in their cars in a laundromat parking lot, and the evidence also indicates that this was an extremely hot day, unseasonably hot, and that there was the use... many people required the use of air conditioning. So it makes perfect sense that there were numerous people waiting in their cars to turn over their laundry, to wait for their laundry, and that they were running their cars because of the air conditioning. Do we have any of what you just said in the record? It is in the record, Your Honor, in the sense that the... I don't recall seeing any evidence about seeing other people in the cars running their air conditioning, etc., etc., what you just said. Did I miss that? I don't think Your Honor missed it, but I do think that the Sergeant Brown clearly testified. You're asking me to speculate in your favor that that was what was going on because it was a laundromat parking lot? It's not a speculation because Sergeant Brown clearly testified at the bench trial that he did not know how many other cars were running. That's a different point. You are asserting there were a bunch of cars running. I'm asserting it's unknown, and because it's unknown, and the government concedes, the record does not establish whether Ryan's car was the only one in the parking lot that was running at the time, as the police only investigated the first two vehicles. That's the answering brief at page 32. So it's unknown how many, but common sense, I think, allows us to draw the inference that there could have been more than one, especially in this context, a laundromat context, and I don't think we leave our common sense at the door, especially when Sergeant Brown and the other officers specifically asked the passenger. Well, I agree with you that we don't leave our common sense at the door. I never heard that before, but I agree with you completely, but isn't it common sense if you have an emergency, you've been told that a woman is being held at gunpoint in a car, you can't see inside the car because the windows are tinted, but you see that one of the cars, at least one of the cars right next to you or close to you is running, so you go in this emergency and open the door. Why isn't that good old common sense, which we don't leave at the door? Your Honor, I think that's actually a question I guess I would answer in two parts. First of all, Your Honor said that she was held at gunpoint, and that is not the record here. Specifically, when you listen to the dispatch audio and the calls between Sergeant Brown and the caller, they specified that it was that the driver had showed a gun, and that's at Exhibit B, and specifically the other critical... He just showed the gun because it seemed like a fun thing to do? Well, I don't think that is necessarily the conclusion that they need to draw, but I will say that the other information they received was that he had wanted her to sell herself, and the record indicates that this is not an immediate process. It involves driving around, finding clients, booking hotels, and placing ads on adult websites. But they've received information that someone has been forced into a car by someone that has a gun for the purposes of attempting to force prostitution. I'm just wondering what, I mean, what are they supposed to, what are they supposed to do to wait until they start driving around before they... No, Your Honor, that's not what we're asking. I think that the First Circuit in Giambra, which we've cited in our briefs, clearly has told that officers may not ignore obvious and available options for gathering facts, and there were at least three options here that were clear and obvious from the circumstances. The first is that Sergeant Brown had a line of communication with the passenger on the phone. He was able to communicate with the caller to speak to the passenger. And specifically, when Sergeant Brown asked, she's not able to give you exactly what kind of car it is at Exhibit B, the answer he received was, she's refusing to tell me. It wasn't that she was unable to tell me, or that this, or that the line had gone dead. It was that she was refusing to tell me. And so this is kind of a rare circumstance, where the person in need of the Sergeant Brown have done in this situation. But the officers, how would they know why there was a refusal to provide the information? I think that's equally susceptible of reading that the person doesn't want assistance, as it is to a reading that the person is in danger and doesn't feel safe to provide it. So I mean, I don't know why that fact helps you. So I think it helps me, because they do articulate a reason. She's scared. And I think in this situation, Sergeant Brown could have said, you can assure her that there's an officer right behind the fence. You can assure her that the officers are actually present on the scene. And that she may be able to give some sort of signal, or she may be able to communicate which car she's in, because they could list the cars. They could say, look, we see the white Ford, we see the gray Audi, we see some other cars. Which one are you in? So the fact that they had this line of communication is incredibly unique in these circumstances. Counselor, would your argument be different if the Audi happened to be the last car they searched? I think it would be the same, because the problem is that they kept on searching, that they did in fact search the first car. So if they had not discovered the occupants in the Audi, they would have kept going. And I think that's the problem. I do want to also, just continuing on other obvious and available options for the officers, after the officers entered the vehicle, and they ended up running the license plate, and the dispatch audio indicates that it was, quote, current to a 2011 Audi to a Lamar Ryan in San Francisco. So in other words, they had the information of the license plates, so they could have run it, and if they had done so, they could have also run Mr. Ryan's criminal history, which would have indicated both that he was on probation and that he had a prior history of solicitation of prostitution. So the time to run the license plates is not after you enter the vehicle. It is before, because that is an obvious and available option. And when you look at the body-worn camera footage, you can see the license plates are clearly visible. And in addition, on this option, we saw that the officers in the body-worn camera video, Wong and Bertolone, were actually present at the scene at around 1210. And they told, they said on the dispatch, we'll just wait till we see you guys. So in other words, they're waiting for Sergeant Brown to come. And they're not there gathering facts. They're not there running license plates. And so I think their response is not one of gathering additional facts to establish that nexus. Theirs is just, let's wait around for Sergeant Brown to roll up. So counsel, let me just make sure I understand your position. Basically, you're saying the police officers did not have any objectively reasonable basis to believe that AT was in the Audi when they searched it? It did not rise to the level of reasonable basis approximating probable cause. So not the tinted windows, not the car running. Again, the tinted windows, it was unclear how many cars had tinted windows. And the fact that they searched the first vehicle, which had tinted windows, but was not running, shows that they were just intending to just keep acting on their hunches and just open doors until they could find the occupants. I think the key fact that they did attempt to search and try to open the door of the white Lexus shows there was no reasonable basis or fact-gathering in this case. That car was not running. I'll reserve some of my additional time for rebuttal. Okay, thank you. May it please the court, my name is Jared Bezine. I represent the United States in this appeal. This court should affirm Mr. Ryan's conviction because the district court did not err in denying Ryan's suppression motion under the emergency exception to the warrant requirement. Counsel, can I just get you to go ahead and jump right in? I'd like to hear the government's response to your friend on the other side where she said there was no reasonable basis. The car was running but all the other cars could have been running or could not have been running. That wasn't really looked into. The fact that they checked the Lexus first and that Lexus wasn't running and the issue with the tinted windows. Your Honor, I think there are a couple of things on that point. First, it's undisputed in this case that the officers were responding to an emergency and that oriented their approach to the parking lot. The record reflects that they did, they took substantial steps as they were going to that parking lot to gather information to try and narrow and focus the search to find the victim here. If you listen to Exhibit B, that's Sergeant Brown's body-worn camera where he's on the phone with the reporting party for 10 minutes as he's going to that laundromat and he's repeatedly trying to get information to focus his search. He doesn't just ask for a description of the vehicle once, he asked repeatedly in case facts change on the ground at that time. But by the time he arrived at the laundromat, they simply did not have that information. What they did know is that the emergency was unfolding at this specific laundromat in a vehicle and that is where they focused their search. They didn't go somewhere else. Instead, they went to the laundromat where the emergency was happening and they looked at vehicles that had indicia of occupancy. I want to emphasize for the that even though there were arguably reasons why they should focus on the car they ultimately focused on, but even if we put that aside, the nature of the emergency allowed them to, in theory, search all eight cars? Yes, Your Honor. That is our position, given the nature of the emergency. Unless, for example, there was a reason for them to believe that those cars were not occupied and were disassociated from the emergency information that they had been provided. But, for example, they did not look into a car where they could see because it didn't have tinted windows that it was not occupied. But they focused on Mr. Ryan's car because at that time it had indicia of occupancy, it was running, and they could not, from the exterior, rule out that that is where the victim was located at the time. Sotomayor, when the recording has the officer saying, as they're going to the second car, it's running, isn't it a reasonable conclusion from that that not every car there was running, that this was one that they saw was running? Yes, Your Honor. I think that's why there was heightened focus on it. The Lexus to the left of Mr. Ryan's Audi did not appear to be running at the time. It was attempted to be checked, I would say, sort of from the outside, but that was all contemporaneous. From the time Sergeant Brown arrived at the laundromat parking lot and got out of his car and the officers started searching, to the time when they opened up the cars of Mr. Ryan's vehicle was only 20 seconds. This was something that unfolded very quickly because it is undisputed they were responding to an emergency here. Can I shift gears for a moment to the sentencing? Yes, Your Honor. So the judge did not give the two points for acceptance of responsibility. And he gave, at least as one of his reasons, that this was a belated acceptance. That relates to the third point, not to the two points, correct? So I think, Your Honor, the third point for acceptance of responsibility relates to saving the government the investment of resources. So there's no reason he should have given the third point, and he didn't. But why shouldn't he have given the two points? The guy offered to plead guilty, providing only that he preserved his constitutional issue, which, as the discussion we're having today shows, was not a frivolous issue. The government said, no, we're going to go to trial, forget about conditional plea. Then, at the trial, he doesn't deny guilt at all. He just challenges the search issues. It's an effect and evidence you're hearing about the search and not really a trial on the merits. What possible reason is there for not giving him the two points for acceptance of responsibility? So, Your Honor, I think Judge Oreck's comments need to be considered in the overall context in which they were made. He did remark that that attempted change of plea happened approximately three days before trial. That goes to the timeliness of Mr. Ryan's conduct, purporting to reflect acceptance of responsibility, which the guidelines and this circuit have said is a permissible consideration in determining whether a defendant manifests genuine acceptance of responsibility, that genuine contrition. I think the key- Forgive me for interrupting, but I'm just not understanding the logic of the argument you're making right now. You're told by your lawyer, let's say you say to your lawyer in my hypothetical, I'm guilty of sin. And the lawyer says, fine, but we've got a issue that is of constitutional dimensions that is unsettled in this circuit. And so we're going to challenge that because if we went on that, the government might not be able to convict you at all. And so you say, fine, how does that assertion of the most basic fundamental Fourth Amendment rights, coupled with no other indication that you're denying your guilt in any way, shape or form, constitute a failure to accept responsibility? And, Your Honor, I want to focus on the last thing you said there. Coupled with no indication that you are contesting your guilt other than preserving that appellate claim. That's what he offered to do. That is not what happened here, Your Honor. I thought he offered to plead guilty, but preserving only this issue. Your Honor, if you look to Judge Oreck's statements on page 41 of the record, before he makes that comment about this attempted change of plea happening approximately three days before trial, he notes that the attempted change of plea happened only after Mr. Ryan's motion in limine seeking to exclude the evidence showing him with the firearm from being presented to the jury. That motion, that motion to exclude the jury from being able to see that evidence, was not predicated on a constitutional claim. It was not predicated on a challenge to whether there was- But it wasn't premised on a denial of guilt. It certainly was, Your Honor. No, it was premised on that the, as I understand it, the motion in limine was that for legal grounds, this evidence should be excluded. The argument that was made, Your Honor, was that the video, this inculpatory video, was only produced after the Rule 16 deadline, which was factually inaccurate. Well, that may be, but why is that in any way, shape, or form a denial of guilt? That's an assertion of a legal right to timely disclosure. Maybe they got it wrong, and the judge held they got it wrong, and the evidence came in. The, I think what you're saying is, in effect, someone gets indicted and even if there's no question in their own mind and in their lawyer's mind that they are guilty and will ultimately have to accept guilt if their legal defenses don't hold water, that nevertheless, if they have meaningful legal defenses, the hell with that. We're just going to throw that away because, by gosh, pleading guilty in the government's view means giving up all your rights. Is that what you're saying? No, Your Honor. I think also it's important to keep in mind here that Judge Orrick was in a unique position being able to see Mr. Ryan and the way he litigated this case all the way up to and through trial as to whether he had genuinely manifested an acceptance of responsibility. And I want to highlight another portion of the- He didn't testify. He did not, Your Honor. So when you say you're saying, what are you talking about? He saw his lawyer making legal arguments. You never saw him. What are you talking about? Did he blink his eyes? Did he grimace? Your Honor- None of that's in the record, and it probably didn't happen. By way of example, Your Honor, he filed motions in limine seeking to present this third-party alternative perpetrator defense. I think that and his conduct with respect to the motion in limine on the EVA trial distinguishes this case from one such as the Luong decision, where, in that case, the defendant was not contesting his actual underlying conduct at all. All he was saying was simply, my conduct does not rise to the level of an interstate nexus. Why did the government not agree to accept his guilty plea contingent only on his preserving his constitutional argument? Your Honor, Mr. Ryan never sought a conditional plea until the eve of trial. So? The government had, at that point in time, the parties were prepared to proceed. We did proceed- So isn't that the rationale that underlies the third point? That's the one about you have to plead. If you want the third point, you have to plead guilty in time to save the government from having to prepare for trial and so forth. It has nothing to do with the other two points. Yes, Your Honor, but the government never argued nor did Judge Orr ever indicate that the saving of resources was a basis for denying Mr. Ryan acceptance of responsibility here. The parties were going to proceed to some sort of evidentiary hearing regardless of what happened, whether that conditional plea was consented to or not. And that's exactly what the parties did after the bench trial. So I don't think there was a question here in anyone's mind of, well, Mr. Ryan didn't save the party's time, and therefore, he's not entitled to acceptance of responsibility. I do want to highlight also in the record page 51 specifically, because Judge Orrick was not dealing with this situation on a blank slate. Mr. Ryan has a lengthy criminal history, including he fell within criminal history category 6. He also had prior convictions that were not even included in his criminal history because they were so dated. And the Court was mindful that Mr. Ryan engaged in a long series of criminal cases. Yeah, well, that goes to the amount of sentence, but in this case, the sentencing guidelines, the height was, I think, 80 to 105 or something like that, and he gave them 105. So his calculation of the guidelines clearly played a role in the judge's determination. He decided, as a bad guy, I'm going to give him the top of the guideline range. And therefore, if he had the top of the guideline range too high because he didn't give the two points, it clearly affected his decision. Your Honor, I think the fact that Mr. Ryan had a previous federal sentencing proceeding where he expressed contrition to the judge who was presiding over that and then proceeded to engage in a long string of criminal conduct affected Judge Orrick's view as to whether any representation about genuine contrition in this case was actually genuine. Well, so if he got the guidelines wrong and we send it back and he still feels, oh, this guy is so bad, I'm going to give him an above guideline sentence. He has, of course, the power to do that. But that's not the issue before us, is it? Your Honor, I think the record is clear here that it was not related to Mr. Ryan's requiring or the fact that the parties went to trial that was what animated Judge Orrick's decision that there was not genuine contrition here. It's really the fact that he filed this motion limineous, seeking to prevent the jury from seeing evidence that he possessed the gun in question, and the fact that his prior expressions of contrition were simply they were not genuine. They rang hollow, Your Honor. And I think that is something Judge Orrick specifically said at sentencing. That is something that really weighs on me. He said that in your prior sentencing proceeding before Judge Cronstadt, when you indicated that you were sorry for your conduct, you either lied or what you said was wholly untrue. And I think that is something that deeply weighed on Judge Orrick when Mr. Ryan was claiming that simply because he purportedly went to trial to preserve his constitutional claims, he was still entitled to credit for acceptance of responsibility. The core issue is, was there, did he carry his burden of establishing genuine contrition here, and the record establishes that he did not, Your Honor. Could you spend just a minute on this question of whether the Cervantes third prong is something that still, that we should still be applying? Certainly, Your Honor. So the government's position is that the Cervantes prong is no longer good law in this circuit. I think going to Judge D'Alba's earlier question, Brigham City did overrule that third prong of Cervantes. Although it appears that cert was granted in that decision to resolve a split among the circuits as to whether the second prong was valid. The court resolved that question, but it also then analyzed how the emergency exception doctrine should be applied. And what it did was it followed a general reasonableness assessment after it was established that there was an emergency that officers were responding to. Specifically, it looked to whether there was an, I'm sorry, on that it considered the reasonableness of the search, both as to the manner and the scope of the emergency. That's from Brigham City at 406 to 407, and that's exactly what Snipes' second prong is. Going to another question, to the extent the court were to find that the Cervantes' third prong is still good law, I think it would be met here, Your Honor. And that's because there was a reasonable basis to associate the emergency with the area to be searched, which was here, the parking lot where the emergency was unfolding. Now, what's the government's position, assuming we agree with you, that if arguendo, the third prong, still applies, it's been met? Do we then, nevertheless, say, well, we want to clarify the law, so we say the third prong is in or out? Or do we just say, so we don't have to reach the issue here? I think that could clear up some confusion that apparently is evident based on Mr. Ryan's arguments here. So if the court would like to clarify that issue for future litigants, I think it would certainly be well within reason in doing so. Your Honors, I see that I'm out of time, so unless there are any further questions, we would request a pardon. Thank you. I'd like to start just by addressing that last point on Brigham City. So Brigham City has been out since 2006, and this issue of the nexus between the place to be searched and the emergency has clearly come up before. And the fact that no other circuit has said that that's been obviated, I think it's a huge deal. Again, more than approximately ten years have passed, and we have cited a circuit, a case from about six months ago, that says clearly. This is from Giambra, which we've cited, a first circuit case from January of 2025, this year. The second requirement of the emergency aid exception is that officers have an objectively reasonable basis to believe that an individual who needs emergency aid is in the place they decide to search. That was critical to their holding because that was a nexus case about whether or not the person in need of emergency aid was in a trailer. But do you think the Ninth Circuit should pay attention to any other circuit? Isn't that contrary to our tradition? Regardless of whether it is contrary to tradition or not, I think this Court, if it determines. That was not a serious question. If this Court determines that the third prong of Cervantes is not good law, it would be at odds with both the First Circuit's opinion, Giambra. Part of the problem is that we already said in Snipe that we were establishing a new test in place of Cervantes. So I just don't see how we, as a three-judge panel, get around that language. We said in Snipe quite clearly that this third prong of Cervantes was superfluous. We didn't say that there didn't have to be any relationship at all between the place to be searched and the emergency. But we did say that we had a new test. And as a three-judge panel, I don't see how we then go back and say, well, no, we didn't really mean it in Snipe. There is still this three prong. But then why did a published opinion in Hopkins say that the third prong was unaffected? I think that was dicta, and I haven't been able to identify any other case since Hopkins that's applied a third prong in the way that Hopkins said existed. I mean, if you have such a case, I'd like to hear it. But I looked through all of our cases, all of those citing Hopkins. I didn't see any that sort of tried to resurrect this third prong of Cervantes in the way that Hopkins maybe attempted to, I think, in dicta. Well, I think the lack of cases shows how outside of the heartland of the emergency exception this case is. And we did point to two cases out of this, not in this circuit. Well, right, no, I'm asking for cases out of the Ninth Circuit because whatever, what other circuits do doesn't matter here. We have a decision in Snipe. We're bound to follow that unless the Supreme Court has overruled us or we've overruled ourselves on Bonk. That hasn't happened so far, as I can see. And I, again, can't see any other case from our circuit that's followed Hopkins. So if you can just focus on that question. Can you identify any other case from our circuit that has followed Hopkins in saying that there is still this freestanding third prong of Cervantes that we should apply? So I don't think I can identify specifically any case in this circuit. But I will also add that the decision in Snipe says that the reasoning is that this third prong has been rendered superfluous. In other words, I think they're merging the third prong with the second prong, which is the manner and scope. Because the manner and scope is also, in many ways, a similar idea or concept to the third prong of Cervantes. And on that point, I did want to bring up, this is both a manner and scope point, as well as a Cervantes third prong point, is that specifically in this case, the officers did knock on the window of the white Lexus. We saw them in the body-worn camera. We've raised this repeatedly on appeal. And never has the government answered us, why can't they do that to the Audi? They said this was quick, but so was the knock on the white Lexus. So that is a similar Cervantes inquiry, but it's also a manner and scope. Counsel, was the Lexus running? I don't think the Lexus was running, but that did not stop them from trying to open that door. We saw clearly in the video they're trying to open the door, which is exactly what they did. So the fact that it was running or not clearly had no bearing on whether or not they were going to open a car. They knocked, correct? Didn't you just make that point that they knocked on the Lexus? They should have knocked on the Audi. And I'm asking you whether the difference could be that the Audi was running. So perhaps knocking on it might have them take off. I don't think that's a meaningful difference in this case because we did cite a Sixth Circuit case called Morgan that sort of explains that there are so many options in an automobile case and that the concerns about alerting people would seem to be alleviated by lesser measures, not increased by them. So it's not explained why alerting and knocking on the door of the white Lexus was necessary when it wasn't running. So why did they engage in this conduct in one case and not the other? Because they clearly did suspect the white Lexus, so then why did they knock on it? And so I think the most troubling part of this argument today was that the government got up here and said that their position is that they could have searched all the cars. That's at least eight to 12 cars. And I want to emphasize, and we didn't have enough time to get this in our reply brief, the Fourth Circuit opinion in Curry. In that case, there was a shooting and there were about five to eight men walking. Why don't you just give us the citation to that case because you're well over your time. Yeah, it's cited in our briefing. It's 965F313. That's the Fourth Circuit in Curry. It was an in-bound opinion that carefully analyzes this issue of individualized suspicion. Okay. Thank you very much. We thank both counsel for their variable arguments this morning. And this case is now submitted. We stand adjourned for the day. Thank you.
judges: THOMAS, ALBA, Rakoff